BASSICK v. ÆTNA EXPLOSIVES CO., Inc., et al.

JOHN v. SAME.

(District Court, S. D. New York. December 19, 1917.)

Nos. 1, 2.

1. BROKERS ⬦19—DISCLOSURE—DUTY.
   The task of a broker is to find a purchaser, and he is not under any obligation to disclose to his principal the purchaser.

2. BROKERS ⬦51—COMMISSIONS—RIGHT TO.
   Where the parties originally contracted at arm's length, a broker cannot be denied compensation, where he without help of his principal produces a purchaser, even though the purchaser was obviously in the market for the principal's goods, and the principal without his help might readily have secured the purchaser.

3. BROKERS ⬦85(10)—COMMISSIONS—EVIDENCE.
   Testimony by other brokers as to the adequacy of commissions received by plaintiffs for brokerage services, while admissible where the issue is quantum meruit, is not admissible where the question is whether the contract is invalid because the amount paid is so excessive as to shock the conscience.

4. CORPORATIONS ⬦406—PRESIDENT—CONTRACTS—VALIDITY.
   Where the president of a trading or business corporation is given general management and control of its affairs, the corporation is prima facie bound by contracts entered into by him in the name of the corporation, if the contracts are within the apparent power of the corporation to make, and a third party is not bound by secret limitations of his authority contained in the by-laws or minute books.

5. CORPORATIONS ⬦407(2)—CONTRACTS—APPARENT AUTHORITY.
   A contract with brokers, made by the president of a company engaged in the manufacture of explosives, who had general management and

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

control of its affairs, whereby they were engaged to sell explosives at a reasonable and fair market price, and to retain any excess as compensation is valid, being an ordinary incident of such business, and it is unnecessary that the contract be ratified by the directors.

6. BROKERS ⟷63(1)—COMMISSIONS—RIGHT TO.

Where plaintiffs, as brokers, effected a sale of explosives on behalf of corporation, and the contract was canceled by the purchaser because of delays in delivery, plaintiffs are entitled to full commissions; the cancellation being solely the fault of the corporation.

7. BROKERS ⟷19—DUTIES—DISCLOSURE.

It is the duty of a broker to act with utmost good faith towards his principal, and to disclose all facts within his knowledge which are or may be material to the matter in which he is employed, or which might influence the action of his principal in relation thereto, and a broker does not discharge all duties by merely carrying out his specific instructions.

8. CORPORATIONS ⟷426(12)—CONTRACTS—RATIFICATION—DIRECTORS.

Where the directorate of a corporation was not informed of all the circumstances relating to a contract made by the president, who was in the active charge of the corporate affairs, whereby brokers were allowed to retain as commissions all sums obtained on the sale of explosives in excess of an agreed price, ratification of such contract, on the theory that the president was in honor bound to keep it, is not binding on the corporation.

9. CORPORATIONS ⟷107(2)—PRESIDENT—AUTHORITY.

Where brokers, who had agreed to sell explosives at a given price, discovering that the market was rapidly enhancing, suggested that they should retain as commissions all sums received in excess of an agreed price, and in pursuance of that plan refused to disclose to the president of the corporation for which they were acting the prices offered, the contract was so unusual that it was not within the apparent scope of the president's authority, though he was in charge of the corporate affairs.

10. CORPORATIONS ⟷426(1)—CONTRACTS—PRESUMPTION OF FRAUD.

Contracts may be so extortionate and unconscionable on their face as to be unenforceable; hence a contract allowing brokers to receive as commissions $1,800,000 for effecting under certain circumstances a sale, amounting to $5,800,000 is so unconscionable as to amount to a gift of corporate property, and cannot be upheld, though ratified by the directorate of the seller company.

11. CORPORATIONS ⟷404(1), 426(1)—POWERS—GIFTS.

While a private person may give away his property, it is beyond the power of the directorate of a trading corporation to make a gift.

12. BROKERS ⟷65(1)—COMMISSIONS—RIGHT TO.

Plaintiffs, engaged in selling explosives, having agreed to sell explosives for the defendant corporation for commissions of 10 per cent., induced the president of the corporation, who had the management of its affairs, to allow them to retain as commissions all sums received in excess of a fixed price. Although the market for explosives was rapidly enhancing, the brokers did not disclose that fact to the president of the corporation, but, contending that he had no interest in the matter, refused to divulge to him the prices they expected to obtain. As a result the brokers under the terms of the contract became entitled to commissions amounting to about 31 per cent. of the entire purchase price. *Held* that, as the brokers were not guilty of actual fraud, they were entitled to receive commissions at the original basis, in view of the particular facts.

13. BROKERS ⟷6—RELATION—WHO ARE.

Where the president of a corporation engaged in the manufacture of explosives, after having conducted negotiations with the prospective purchaser, turned the matter over to plaintiffs, who were acting for the corporation as brokers in other matters, with directions that they should

---

⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

conclude the contract, plaintiffs were not, as to such purchaser, acting as brokers.

14. CORPORATIONS ☞407(1)—CONSTRUCTION—COMPENSATION.

An agreement by a corporation to pay $300,000 for services in partly assisting to bring a well-developed negotiation to a close on a contract of $6,400,000 is void as unconscionable, amounting to a gift, which neither the president, who had the management of the affairs, nor the board of directors, could authorize.

15. CORPORATIONS ☞427—RECOVERY OF MONEY PAID UNDER PRESIDENT'S CONTRACT.

Where plaintiffs, at the request of the president of a corporation, performed services in concluding negotiations with a prospective purchaser, and there was nothing fraudulent in their conduct in so doing, amounts paid plaintiff, though unconscionable, cannot, in an action by them for commissions claimed for other services, be recovered by the corporation.

16. CORPORATIONS ☞407(2)—CONTRACTS—VALIDITY.

An agreement by the president of a corporation, who had management of its affairs, to pay brokers commissions amounting to more than 13 per cent. for concluding a contract, where the negotiations were well under way and might readily have been consummated by the president, is unconscionable, and cannot be upheld as against the corporation.

17. BROKERS ☞86(1, 4)—CONTRACTS—EVIDENCE.

In an action for commissions as brokers, evidence *held* to show that plaintiffs were not only not the efficient cause of the contract, but that they were not in any sense brokers.

18. CORPORATIONS ☞427—CONTRACTS—VALIDITY.

Payments made to brokers, who performed services in connection with closing a contract, cannot be recovered back by the corporation for which they acted, though flagrantly out of proportion to the service.

19. BROKERS ☞86(8)—CONTRACTS—EVIDENCE—SUFFICIENCY.

In an action by brokers for commissions for effecting an alleged sale, evidence *held* to warrant recovery of the commissions claimed.

20. BROKERS ☞86(4)—COMMISSIONS—EVIDENCE—SUFFICIENCY.

In an action by brokers to recover commissions for effecting an alleged sale, evidence *held* insufficient to show that they were the producing cause of the sale or entitled to commissions.

21. CORPORATIONS ☞417—CONTRACTS—VALIDITY—GIFTS.

Where brokers were not entitled to any compensation as commissions on account of a sale, a so-called compromise contract entered into by the president of the seller corporation, who had charge of its affairs is invalid as a gift, and does not bind the corporation, it not being within the scope of the president's authority to compromise a wholly baseless claim, and hence such agreement could not be rendered valid by ratification by the directorate.

22. BILLS AND NOTES ☞335—ACTIONS—DEFENSES.

Holders of notes with notice take them subject to all defenses and counterclaims against the original parties.

23. CORPORATIONS ☞487(2)—CONTRACTS—ULTRA VIRES—PART PERFORMANCE.

Part performance will not save an ultra vires contract, and the fact that a corporation made payment on notes issued without authority does not render them efficacious.

At Law. Actions by Edgar W. Bassick and by Herbert F. John against the Ætna Explosives Company, Incorporated, and George C. Holt and another, as receivers of the Ætna Explosives Company, Incorporated. Defendants set up a cause of equity, and prayed for affirmative relief. Judgment in part for plaintiffs, and in part for defendants.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James A. O'Gorman, George Gordon Battle, Louis B. Eppstein, and Harry A. Rosenberg, all of New York City, for plaintiffs.

George L. Ingraham and John B. Stanchfield, both of New York City, Robert G. Dodge, of Boston, Mass., and William M. Parke and J. Arthur Leve, both of New York City, for defendants.

MAYER, District Judge. The substantial amount involved, the number of the agreements between the parties in controversy and the contracts to which they relate, and the varied facts and circumstances leading up to and surrounding them, require a rather full statement of the case. The actions are at law. The defendants, inter alia, set up a cause of equity (Ætna Explosives Co. v. Bassick, 220 N. Y. 767, 116 N. E. 1032), and ask for affirmative relief. By stipulation, the causes were tried by the court without a jury.

The original complaints were framed on the theory that the services performed by plaintiffs in all instances were those of brokers, and the recovery demanded was for commissions, or for the amount of certain notes arising out of commissions. As all the litigants are desirous of a decision on the merits, without danger of the case going off on some technicality, permission was given liberally to amend the pleadings to conform with the proof. Reference to the pleadings, where necessary, will be made as the different phases of the litigation are discussed.

In November, 1914, Arthur J. Moxham (hereinafter called Moxham) and Frederick L. Belin (hereinafter called Belin), who had been associated in an executive capacity with the Du Pont Powder Company, organized the defendant Ætna Explosives Company, Incorporated (hereinafter called Ætna), and caused it to be incorporated under the laws of New York on November 28, 1914. Thereafter Ætna acquired the plants and assets of Keystone National Powder Company, Ætna Powder Company, and Miama Powder Company, which theretofore had been engaged in manufacturing dynamite and black powder for commercial purposes. At the outset Ætna had an authorized capital stock of $7,000,000 common and $5,500,000 preferred, but by subsequent action it was provided that the amount of capital should be $18,000,000. Presumably the stock is widely held by the public.

From the beginning until March, 1916, the board of directors of Ætna (with the exception of the first few days when there were dummy directors) was composed of Moxham, Egbert Moxham, his son, Belin, and his cousin, C. A. Belin, and Josiah Howard, who had been connected with the Keystone Company. Moxham was president from February, 1915, until March, 1916, and Belin was treasurer from February, 1915, until November, 1916. In March, 1916, the board of directors was increased from five to nine, the personnel was changed, and later this new board ordered that no more notes be given and that no further payments be made on account of the agreements with Bassick.

One of the actions brought by Bassick and the action brought by John are based upon notes—18 to Bassick, aggregating $321,583.78, and 5 transferred by Bassick to John on account of the latter's share, aggregating $141,564. The complaint (as amended) in the other action

of Bassick (called in the case the contract action) alleges various causes of action in which Bassick asserts a claim either as a broker or for services rendered to Ætna in connection with the sale of explosives. The total amount of the judgment demanded is upwards of $3,000,000. The amounts represented by the notes sued on by Bassick and John, as well as by certain other notes transferred by Bassick upon which actions have been brought in the New York Supreme Court by one Delancey Smith (on a note for $135,973.71) and Lenpier Trading Company, Incorporated (on a note for $101,931.91), are included in the amount sought to be recovered in the contract action, and no credit is given by Bassick in his complaint for any of the sums represented by those notes.

The answers to these actions set forth that the agreements with Bassick were made without authority, that the amounts involved were so excessive as to amount to a gift of corporate funds, and that Bassick, in violation of his duty as a broker, concealed material facts from Moxham, and thus induced him to enter into certain of the attacked agreements. The answers further set forth that large sums in cash, $170,000 in the form of 1,700 shares of preferred stock, and large sums in payment of notes have already been paid out by the president and treasurer of Ætna without authority and in violation of their duties. The affirmative relief sought is:

"(1) That the alleged agreements for commissions and all notes assumed to be given in pursuance of said agreements be declared void, and that said agreements and notes be delivered up and canceled; (2) that the fair value of any services that may have been rendered by Bassick in connection with the sales of explosives, if it be found that services were rendered and that they had any value, be ascertained; (3) that Bassick be ordered to account; and (4) that Bassick and John be ordered to reconvey to the Ætna Company so much of the 1,700 shares of its preferred stock as is now owned and controlled by them and to account for and repay all sums of money received by way of dividends on said shares. In addition to the above, the answer sets forth counterclaims for money had and received, based upon the misconduct of the plaintiff as broker for the defendant, the fact that the agreements were made without authority, and the unconscionable character of the agreements, and asks for the recovery of the money paid to the plaintiff under the various agreements."

There were in all 11 contracts of sale by Ætna to various vendees, upon which Bassick claimed commission or compensation. In the pending actions, plaintiffs' complaint in the contract action seeks recovery for commissions or services on 9 of these contracts. Seven of these contracts were with the French government, represented in four instances by Col. Johannet, controller of the French Purchasing Commission, and in three instances by J. P. Morgan & Co. Two contracts were made with Canadian Car & Foundry Company, Limited (hereinafter called Canadian Co.). Besides these 9, there are 2 other sales to the French government, through Col. Johannet (of smokeless powder, dated March 15, 1915, and March 26, 1915), which, while not made the basis of any recovery by Bassick, enter into the counterclaims of defendants.

It has been agreed that the ascertainment of the exact figures involved in each action and in each contract shall be delayed until the judgment upon this decision is ready for entry. The following table displays data as to the contracts:

| Cause of Action. | Plaintiff's Exhibit. | Date. | Purchaser. | Material. | Amount. | Price. |
|---|---|---|---|---|---|---|
| 1st | 26 | Mar. 1/15 | French government through H. J. Johannet | Toluene | 82,000 gallons | $ .60 |
| 2nd | 27 | Mar. 9/15 | French government through H. J. Johannet | Gun cotton | 5,400,000 lbs. | .60 |

(Note: Option for additional 2,100,000 lbs. was provided for in this contract and accepted on October 15, 1915. Plaintiff's Exhibit 37).

| Cause of Action. | Plaintiff's Exhibit. | Date. | Purchaser. | Material. | Amount. | Price. |
|---|---|---|---|---|---|---|
| 5th | 28 | Mar. 9/15 | French government through H. J. Johannet | T N T | 4,000,000 lbs. | 1.00 |
| 3rd | 29 | Mar. 9/15 | French government through H. J. Johannet | Picric acid | 4,000,000 lbs. | 1.45 |
|  | 30 | Mar. 13/15 | French government through H. J. Johannet | Smokeless powder | 2,805,000 lbs. | .97 |
|  | 31 | Mar. 26/15 | French government through H. J. Johannet | Smokeless powder | 1,800,000 lbs. | .97 |
| 8th | 32 | May 12/15 | Canadian Car & Foundry Co, Limited | Smokeless powder | 6,400,000 lbs. | 1.00 |
| 9th | 33 | May 20/15 | Canadian Car & Foundry Co, Limited | T N T | 1,000,000 lbs. | 1.15 |
| 4th | 34 | Dec. 17/15 | French government through H. J. Johannet | Gun cotton | 5,250,000 lbs. and 750,000 lbs. a month beginning July 31/16 until 30 days after close of war. | .55 |

(Note: The 55 ct. price on this contract of December 17, 1915, was subject to a discount of 2½ cts., making 52½ cts., net.)

| Cause of Action. | Plaintiff's Exhibit. | Date. | Purchaser. | Material. | Amount. | Price. |
|---|---|---|---|---|---|---|
| 6th | 35 | Mar. 31/15 | French government through H. J. Johannet | Smokeless powder | 3,000,000 lbs. | .80 |
| 7th | 36 | Mar. 31/15 | French government through H. J. Johannet | Smokeless powder | 1,000,000 lbs. a month beginning May 1/16 until 30 days after close of war; | .80 for 1st 3 months delivery; 75 cts. for all deliveries thereafter. |

The following table shows the total of the amount heretofore paid plus the amount claimed by Bassick to be still payable:

| The Contract | | Amounts Payable to Bassick. |
|---|---|---|
| Plaintiff's Ex. No. | | |
| 26 | Toluene | $ 49,200.00 |
| 27 & 37 | Gun cotton........ | 585,000.00 |
| 28 | T. N. T.... | 400,000.00 |
| 29 | Picric acid..... | 1,800,000.00 |
| 30 | Smokeless powder.... | 272,085.00 |
| 31 | Smokeless powder.... | 174,600.00 |
| 32 | Smokeless powder.... | 316,800.00 |
| 33 | T. N. T.... | 150,000.00 |
| 34 | Gun cotton.... | 329,403.76 |
| 35 | Smokeless powder.... | 90,000.00 |
| 36 | Smokeless powder.... | 358,180.31 |
| | Smokeless powder.... | 160,000.00 |
| Total | | $4,685,269.07 |

In addition to the foregoing, Bassick claims continuing commissions from March 1, 1917, of some $57,000 (in round numbers) per month on the two French contracts (per J. P. Morgan & Co.), of (a) December 17, 1915, for gun cotton, and (b) March 31, 1916, for 1,000,000 pounds of smokeless powder per month. While it is desirable to set forth the history of the transactions chronologically, in order to see the true picture of the dealings and relations between the parties, it will be helpful, preliminarily, to group the agreements into six classes:

(1) The 10 per cent. agreements relating to toluene, T. N. T., and two smokeless powder contracts—all with the French government per Johannet.

(2) The agreement relating to picric acid with the French government per Johannet.

(3) The agreement relating to gun cotton with the French government per Johannet.

(4) The Canadian Co. agreements relating to smokeless powder and T. N. T.

(5) The former Bridgeport contract, transferred to the French government per J. P. Morgan & Co.

(6) The gun cotton contract and the 1,000,000 pounds per month smokeless powder contract with the French government per J. P. Morgan & Co.

The contentions of defendants are as follows:

With regard to class 1: (a) Lack of authority, including concealment by Moxham and Belin of the facts from Howard; (b) unconscionable character of the agreement for compensation.

With regard to classes 2 and 3: (a) All of the grounds applicable to class 1, and in addition (b) concealment of vital information from Moxham by Bassick (which includes John) in violation of his duties as broker; (c) lack of power on the part of Moxham to consent to such concealment; and (d) in any event, ignorance of the board of directors

of all the facts when it is claimed the board consented to the Bassick-Moxham agreement.

With regard to classes 4, 5 and 6: (a) That John, acting for Bassick, did not find the purchasers; and (b) that the services, if any, performed by John were negligible and so insignificant that an agreement to pay these large commissions was disproportionate to the point of being unconscionable and void and equivalent to an unauthorized gift of corporate funds. In answer to these contentions, plaintiffs assert: (a) That all the agreements were made with due authority; (b) that the amounts agreed upon were matters of complete understanding which cannot be held void nor set aside by the court merely because the sums are large; (c) that, in all the circumstances, these amounts were fair and not unconscionable and that the contracts were of great service to Ætna, and (d) that the price mentioned in negotiations for picric acid was concealed with the consent of Moxham and Ætna; and (e) in respect of the French government contracts per J. P. Morgan & Co., that, in any event, after a controversy, a settlement was had whereby in consideration of such settlement, Bassick agreed to forego certain other claims against Ætna for commissions on all contracts made with the French government.

With this outline, the story of the events may be proceeded with.

In January, 1915, Charles Lanier, Jr., connected with the Lenpier Company, had written to M. Margueryol, the predecessor of Col. Johannet, offering a quantity of toluol to the French government. M. Margueryol, when he returned to Paris, submitted Lanier's letter to the French War Department, with the result that on February 12, 1915, the French Minister of War cabled to Col. Johannet, authorizing him to purchase from Lanier the offered toluol. Col. Johannet, on February 12, wrote Lanier accordingly. On February 15, Lanier answered this letter, stating that conditions had changed since he had written Margueryol, and that he believed the toluol had been sold.

Meanwhile, about February 1, 1915, M. Jusserand, the French Ambassador to the United States, had written Col. Johannet, in effect, to get in touch with Moxham in regard to the possible sale of military powders by Ætna to the French government. Col. Johannet wrote Moxham on February 1 with the result that an interview took place between Johannet and Moxham on February 3, at the French Chamber of Commerce in New York City. A full memorandum of this interview made contemporaneously by Moxham, shows that the outlook for the purchase of explosives by the French government was most encouraging, and also that the French government was keen at the moment to purchase smokeless powder. Correspondence then followed between Johannet and Moxham in which, among other things, Johannet informed Moxham that:

"Specifications of the sundry specimens of powder * * * are being sent me by mail. As soon as I am in possession of said specifications, viz. in about ten days, I shall at once communicate same to you."

To which Moxham answered:

"We will await your further advices in the matter of the powder."

This was followed on February 6 by a pleasant letter from Moxham to Johannet, stating that:

"We hope you will not hesitate to call upon us, should any occasion arise wherein we can aid you."

There the supine Moxham let matters rest. The door for negotiations was freely opened to him under the most favorable auspices, but he did not enter. Prior to February 12, the date when Lanier received the letter from Johannet regarding toluol, the Lenpier Company had had some negotiations with Bassick, and had asked him whether he could obtain sufficient toluol to fill the order to supply the previously offered toluol which it had lost. Bassick stated that he would attempt to accomplish this. At that time Bassick was in the munitions brokerage business, having organized (the previous fall) a staff of associates, of whom John was one.

In February, and prior to February 18, Bassick was desirous of securing a large quantity of gun cotton by reason of expectations arising out of pending cable negotiations with London. On February 18, 1915, a letter was written in Bassick's name to Ætna "attention of Mr. Sallade" as follows:

"On behalf of E. W. Bassick and based upon a firm acceptance by cable from a strong banking house in London, we make you an offer for gun cotton * * * as follows: * * * Total 5,000,000 pounds or more, 250 tons during May, 400 tons monthly thereafter. * * * The price is 55 cents per pound shipside New York. * * * Upon signing of contract 25 per cent. in cash will be deposited against the entire contract and the balance to be paid as shipments are ready."

Up to this time there is no question that neither Bassick nor any of his associates had met any of the officers of Ætna, and it is clear that their acquaintance began under entirely natural and proper circumstances. On receipt of the letter supra, Moxham telephoned Bassick, asked him who he was, and to whom he could refer as to his responsibility, and Bassick gave him his references. Moxham investigated these references and found and was satisfied that Bassick was a reputable and responsible business man of Bridgeport, Conn.

On the morning of February 19, 1915, Bassick and John met Moxham for the first time. Moxham told them that the price of gun cotton was about 55 cents per pound. John told Moxham about negotiations that were being carried on by Bassick and himself with Sir Frank Crisp, a London solicitor, for gun cotton, and that he was convinced of the likelihood of making a deal through Crisp. The result of this interview, so far as it related to gun cotton, is expressed in a letter dated the same day from Moxham to Bassick as follows:

"Pursuant to our verbal discussion and based upon assurance from you that you have firm cable acceptance of the purchase of a certain amount of gun cotton, we hereby authorize you to carry on the details of this negotiation with a view of drawing it to a successful conclusion. * * * The price to you is fifty-five cents (55c.) per pound on dock f. o. b. New York. * * * It is understood that the selling price above the stipulated amount of fifty-five cents (55c.) is to go to you in lieu of services rendered and disbursed according to your instructions."

On the afternoon of this same day Bassick and John went with Moxham to the Bankers' Trust Company in connection with the Crisp negotiation. There can be no doubt that Bassick and John then believed they could carry the transaction through with the London interests, that at this time they made no misrepresentations as to the sale of gun cotton, and that no questions were asked nor information desired by Moxham as to the price at which Bassick and John expected to sell the gun cotton. Moxham fixed a price for the product in regard to the adequacy of which no attack can be successfully made, and it is entirely clear that the subject of gun cotton, which was the occasion for the opening up of relations between Bassick and Ætna, was, at this time treated as separate and apart from any undertaking as to compensation for the sale of other commodities.

On this morning of February 19, the only prospect in sight, so far as Bassick and John were concerned, was the sale of gun cotton to the London interests, and at this time they were naturally dealing in this regard at arm's length to get the best quotation possible. As to gun cotton, they clearly had not as yet assumed the relation of broker to principal. Either at this interview or on the following day certain important arrangements were made as to the future relations of the parties, to which reference will presently be had. Late in the afternoon of this February 19, John was introduced to Johannet by Lanier at the French Chamber of Commerce, and the proposed sale of toluol was discussed, and the outlook for a sale seemed hopeful. On February 20, John told Moxham that he believed he could get an order for toluol, but did not tell Moxham who the purchaser was, and was not under obligation so to do.

At the interview between Moxham and Bassick and John on February 19, or on the following day, it was agreed that Bassick was to receive a commission of 10 per cent. "on all commodities that he sold for the Ætna Explosives Company," and at that time Moxham told them that the price of picric acid, smokeless powder, and T. N. T. was $1 per pound. By virtue of that interview the strict relation of broker to principal between Bassick and Ætna was established in all respects, except as to gun cotton. Moxham testified that he told Bassick and John, at either his first or second interview with them, that he had met Johannet and could do business with Johannet as well as they could, and it would seem that at this time, and until about a year and a half later, Johannet supposed that Bassick and John were employés of the Ætna and not brokers nor middlemen—Johannet not desiring, from his own viewpoint of policy, to deal with middlemen.

[1, 2] But these facts are immaterial. Moxham's failure to follow up the opening with Johannet did not impose any obligation upon Bassick and John to refrain from obtaining orders from Johannet, nor did Johannet's aversion to middlemen, even if it had been communicated to Bassick and John, concern them in their relations to Ætna. Their task was to find a purchaser, and a broker is not under any obligation to disclose his purchaser. Indeed, if he did, the principal would often go over his head. If the principal has not sense nor energy enough to do business with an obvious or possible purchaser, he cannot complain if

the broker, without his help, produces that same person as a purchaser.

Having now an agreement for broker's commission of 10 per cent., John, on February 23, told Johannet that he represented a manufacturer which could furnish the toluol, and Johannet addressed a letter to Bassick, stating that he would sign "with you or your principals" a contract for the purchase of toluene, and outlining the terms of the contract to be made (Plaintiff's Exhibit 39). On February 28, John, together with Belin, Eppstein (who was interested in the Lenpier Company), Egbert Moxham, and a Mr. Peyton, called upon Johannet, and the contract for toluene was arranged in the name of Ætna.

John succeeded in getting Ætna to agree to fill this order upon condition that the French government would accept for its earlier deliveries monitrotoluol and dinitrotoluol, and this was done and the toluol contract dated March 1, 1915 (Plaintiff's Exhibit 26) entered into. This, so far as appears, was the first contract for the sale of military explosives made by Ætna with anybody.

Prior to the closing of the toluol contract, John became convinced that the French government at Paris was in the market for gun cotton on a large scale and testified that he so informed Johannet, that Johannet stated that he had no instructions to buy gun cotton, and that if his government so desired, he would probably receive instructions at the end of the week—February 27, 1915. The instructions were not received that week and John persisted with Johannet that the French government was in point of fact in the market for gun cotton. It would seem, as a result of John's persistence that on March 5, Johannet cabled to the French War Office:

"That Ætna Explosives Company offers us gun cotton * * * at fifty-eight cents a pound. Is it correct that this produce should be looked into? If so, cable me to what extent. * * *"

Johannet testified that his first talk with John on the subject of gun cotton was on March 4 or 5. Johannet's testimony is, of course, highly reliable; but he depended, not on recollection, but upon a remarkably systematic and accurate "dossier." It is quite possible that he saw no occasion to make full entry of conversations which merely related to John's suggestion of a possible desire of the French government to buy gun cotton. There is no reason to believe that John's recollection in this regard is faulty. In any event, John, prior to March 7 (Johannet testified on March 4 or 5), had offered gun cotton on behalf of Ætna at 58 cents per pound. This was quite in accord with the figure quoted by Moxham to Bassick in a letter "to confirm our agreement with you" dated March 5, 1915 (Plaintiff's Exhibit 50), in which Moxham also stated that the order then contemplated "was subject to a ten per cent. commission to you" (Bassick). On March 7, Johannet received word from Paris that gun cotton was being offered there on behalf of Ætna at 66 cents. Immediately on receipt of this he wrote a letter, dated March 7, addressed "To the President of the Ætna Explosives Co., c/o Mr. Charles Lanier, 59 Cedar St., City," stating:

"In pursuance of our recent conversation in relation to a possible supply of gun cotton by the Ætna, * * * I have just received from my govern-

ment instructions authorizing me to follow that affair. I would be obliged to you if you could come to discuss the matter with the authorized representatives of the company to-morrow at 4 p. m."

Lanier, to whom this letter was handed—presumably by Johannet's secretary—did not wait until the next day (Monday), but got in touch with John, and on March 7 (Sunday) went to the Hotel Lafayette (Col. Johannet's headquarters) with John and Eppstein, and sent a note to Johannet stating that he had shown Johannet's letter to Eppstein and John, and requesting an interview that afternoon or evening. This interview was had, and Johannet stated that he was willing to place an order for 5,400,000 pounds of gun cotton. Picric acid and T. N. T. were also discussed at that interview, to which reference will be made infra.

Much is argued by defendants to the effect that this letter was intended for Moxham and that Lanier, John, and their associates practiced a species of deceit upon Moxham and Ætna by treating the letter as addressed to Lanier and his associates rather than to Moxham. The phraseology of the letter, "In pursuance of *our recent conversations*" (italics mine), fully refutes this accusation, and, besides, the record contains letters from Johannet previously written to Moxham, addressed to him at 2 Rector street, and other letters written to Lanier, addressed to him at 59 Cedar street, showing clearly that this letter under discussion was intended for Lanier, and, therefore, that Lanier, John, and Eppstein were fully justified in carrying on their talks with Johannet without delivering this letter to Moxham.

John, undoubtedly, did some clever and prompt work that Sunday of March 7. Laying aside, for the time being, the discussion of the picric acid contract, he (which always means as representing Bassick) had an arrangement for a 10 per cent. commission on the sale of all explosives except gun cotton, and as to that he had an understanding that he would get everything over 55 cents a pound. Moxham had indicated by his letter of March 5 (Plaintiff's Exhibit 50) that he would be satisfied with 52.2 cents net; i. e., 58 cents, less 10 per cent., or 5.8, leaving 52.2 cents net. Johannet was anxious to buy. Moxham was inert through accident or design (but that was none of John's affair at this time), and John closed, not only an agreement for gun cotton, but also for T. N. T. at $1 per pound. On March 8, John appeared at the Ætna office with orders for gun cotton, T. N. T., and picric acid. These orders eventuated in the contracts of March 9, 1915: (a) For gun cotton at 60 cents; (b) for T. N. T. at $1; and (c) for picric acid (infra).

As to gun cotton, it is perfectly clear that, while the original offer of Bassick contemplated a sale to London interests, it was immaterial to Ætna to whom Ætna sold or to whom Bassick sold. This original situation did not change. Neither Bassick nor John attempted to obtain any agreement to increase their profit on a gun cotton sale. Indeed, Moxham's letter (Plaintiff's Exhibit 50) showed that he was willing to take less net than Bassick and John originally proposed. The situation was quite different from that which developed in regard to picric acid. If, as seems to be the case, Bassick, before making the

55-cent agreement with Moxham, had seen the cablegram, Exhibit U, dated February 19, 1915 (from London & Midland Bank to Bankers' Trust containing offer from Sir Frank Crisp to buy gun cotton at 75 cents for March and April deliveries and 62 cents thereafter), he was under no obligation to disclose its contents to Moxham. If, perchance, Bassick saw this after the making of the 55-cent agreement, he was still under no obligation to disclose the Crisp price, because Moxham had fixed the price *and* no attempt was made to change the arrangement to the disadvantage of Ætna. It is true that at the end John induced Johannet to pay 60 cents and "squeezed in a cent or two more on Ætna," but that was mere open bargaining between grown-ups.[1] The net result was that Bassick and John made 7.8 cents on 60 cents, or 13 per cent.—the equivalent to Ætna of 10 per cent. on 58c.

Little time need be spent on the two (10 per cent. commission) smokeless powder sales to the French government represented by the contracts of March 13 and March 26, 1915. These were plainly obtained by John, and were for smokeless powder for small guns, while the original and not followed-up negotiation between Moxham and Johannet was for smokeless powder for large guns. The 10 per cent. agreed to be paid for commissions on the toluol, T. N. T., and these two smokeless powder contracts and the profit to Bassick on the French (Johannet) gun cotton contract were far from unconscionable amounts.

[3] Ætna was in the early stages of its career, and, while Moxham could undoubtedly have obtained the same results, that, per se, is no reason why Bassick can be deprived of compensation. The condition of Ætna was far from desperate, as Moxham would wish believed; but, because of his conduct, it needed business, and why it needed business was no concern of Bassick. The testimony of several brokers was admitted, not on the question of adequacy, but of unconscionability. Each of these brokers conducted transactions having features different from that of the case at bar, and not only on a much smaller scale, but also for different kinds of principals, under different circumstances. Such testimony is serviceable where the issue is quantum meruit, but not where the question is one of a contract, where the agreement fails only if the amount to be paid is so excessive as to shock the conscience. Nor is it material whether a broker accomplishes his result in a day or a year. It is the result which counts, and the agreement is based on the result.

[4, 5] There remains on this branch (excluding pro tempore the picric acid contract) only the question of authority. In my opinion, the employment of brokers to sell explosives for a company engaged in that business, or the agreement to sell one of these commodities at a reasonable and fair market price (as in the case of gun cotton), and allow the difference to the arm's length negotiator for his profit or compensation, is an ordinary incident of such a business. The principle is concisely stated by Mr. Justice Page in Ætna Explosives Co. v. Bassick, 176 App. Div. 582, 163 N. Y. Supp. 921, as follows:

---

[1] The probable explanation, partly dehors the record, is given at pages 62 and 63 of plaintiff's reply brief.

"It is well settled in this state that where a president of a trading or business corporation is given general management and control of its property, business, and affairs, the corporation is prima facie bound by contracts entered into by him in the name of the corporation, if the contracts are within the apparent power of the corporation to make, and a third party entering into such contracts is not bound by secret limitations of his authority contained in the by-laws. Oakes v. C. W. Co., 143 N. Y. 430 [38 N. E. 461, 2 L. R. A. 544]; Powers v. Schlicht, 23 App. Div. 380 [48 N. Y. Supp. 237], affd. on opinion below 165 N. Y. 662 [59 N. E. 1129]."

But, in addition to the foregoing, the record is abundant with proof that the directors knew and authorized these agreements with Bassick after a spirited discussion, and I am fully satisfied by the testimony of both Moxhams that a resolution was passed (although not recorded) in regard to commissions on the March 9 contracts. Indeed, Egbert Moxham particularly impressed me as a truthful and honorable man. The method of keeping books and the continuing payment of these commissions, elaborately illustrated by documents and extracts in evidence, serve to confirm fully the conclusion that these Bassick transactions were ratified by all the directors, if that were necessary—and I think it was not, because within the apparent power of the corporation acting through its president.

Many pages of the record and the briefs are devoted to showing whether or not knowledge of what was being done was kept from the director Josiah Howard. This controverted point is promptly disposed of when I state that Howard was hopelessly confused, and, while doubtless he is a well-meaning man, his recollection is so uncertain as to preclude reliance thereon for any finding of fact based on his memory. In addition to many other reasons, the testimony of Graham, a clear-headed and most reliable witness, still in the employ of the receivers, would resolve any doubt in this regard if such existed.

[6] Finally, the argument is advanced that plaintiffs are entitled to commissions only on so much of the explosives as were actually delivered and paid for. On this branch of the case the argument applies to the T. N. T. contract which was canceled by the French government because of delays in delivery. The rule is elementary that, in the absence of an agreement to the contrary, a broker is entitled to full commissions if the failure to deliver is due to the fault of his principal. There was a dispute in this regard between Moxham and Bassick; but, taking Moxham's testimony and his letter of July 16, 1915, claimed to be corroborative (if admissible on this point), the contention is not borne out. Moxham was asked: " * * * You never agreed * * * that they should be paid any commissions except as and when you received the money under the contract that they obtained," and he answered, "That is correct." He also wrote on July 16, 1915: "In other words, if we do not receive our pay in whole or in part, your commission is to be reduced accordingly." Both the conversation and the letter mean no more than that, if Ætna fulfilled its contracts and the vendees did not pay, Bassick would not get his commissions. They did not mean that Bassick would lose his commissions if Ætna defaulted.

For the reasons above outlined, a recovery may be had against defendants on the T. N. T. and gun cotton contracts, with interest from the dates when the respective payments of commissions were due, and

the counterclaim in respect of the two smokeless powder contracts is not sustained.

### The Picric Acid Contract.

[7] From the time of the first interview between Bassick and John on February 19, with Moxham, or, in any event, the succeeding interview, Bassick and John concededly (on their own testimony) occupied the relation of broker to principal in regard to the sale of explosives as then discussed, except gun cotton. "We did not talk about picric acid specifically, but it was understood that we were to receive a commission of 10 per cent." (John, pp. 237, 238; Bassick, p. 902½.) At that time Moxham said the price of picric acid would be $1 per pound.

It is entirely clear, and was made so to Bassick and John, that Moxham fixed this price because that was what the Du Pont Company was getting. The Du Pont Company was an old established concern, highly organized and, presumably, fully equipped. At this time, Ætna did not have a picric acid plant, nor the land on which to build one, and, in order to manufacture this commodity, it would be necessary to erect a plant and have it properly manned and equipped. The suggestion that this was a provident price, based on an estimate, as stated by Moxham and Egbert Moxham, that picric acid could be manufactured at 50 cents per pound, is not borne out. While there is some testimony to that effect by both Moxhams, I am satisfied that they are in error (inadvertently), because the letter of Moxham to his son, dated May 21, 1915 (Defendants' Exhibit P1) and stating:

"The inclosed is the *first· effort* on our part to get some sort of a line on the probable cost of material for both picric acid and T. N. T., and I have no doubt it will be interesting to you. * * * All this is only a rough guide for the present, but it is better than nothing" (italics mine)

—accurately fixes the date when the first estimate was made as being in May, 1915, two months after the picric acid contract was signed. As brokers, Bassick and John owed the highest duty to Ætna—a proposition admirably stated in 4 Ruling Case Law, § 22, from which the following is an extract:

"It naturally follows from the general rule requiring a broker to act with the utmost good faith towards his principal, that he is under a legal obligation to disclose to his employer all facts within his knowledge which are or may be material to the matter in which he is employed, or which might influence the action of his employer in relation thereto. A broker does not fulfill the measure of legal requirements by merely carrying out his specific instructions, for he owes the further duty of making a full, fair and prompt disclosure of all facts affecting the principal's rights or interests, or in any way pertaining to the discharge of his agency."

See, also, Cardozo v. Middle Atlantic Immigration Co., 116 Va. 342, 82 S. E. 80; Holmes v. Cathcart, 88 Minn. 213, 92 N. W. 956, 60 L. R. A. 734, 97 Am. St. Rep. 513; Wadsworth v. Adams, 138 U. S. 380, 11 Sup. Ct. 303, 34 L. Ed. 984; Dickinson v. Tysen, 209 N. Y. 395, 103 N. E. 703; Low v. Woodbury, 107 App. Div. 298, 95 N. Y. Supp. 336.

At the time (whether February 19 or 20) when Moxham fixed the price of picric acid at $1 per pound, and agreed with Bassick and John

on a 10 per cent. commission, the agreement was fair and proper. The negotiation was on with Crisp for gun cotton (Exhibits S, U, and V), but negotiations for picric acid had not begun. The proposal for selling picric acid with Crisp and another party, according to John, "developed a day or two after meeting Mr. Moxham." The London negotiations proceeded in part through the London City & Midland Bank (communicating with the Bankers' Trust Company in New York) and partly through one Hodges in New York (communicating with one Proctor in London). The importance of the subject warrants the setting out of the cables interchanged; all of the following having been seen by both Bassick and John:

"Exhibit P—Cablegram, Proctor to Hodges, February 24, 1915: 'Have sold entire output picric acid eighty per cent. acid twenty per cent. water dollar sixty-five per pound net to you dollar sixty will deposit twenty-five per cent. against bond instruct principals to have New York bank cable London bank authorization to sign contract Crisp representing us other contracts progressing rapidly.'

"Exhibit N—Cablegram, Bankers' Trust Company to London City & Midland Bank, February 24, 1915 (Moxham's deleted copy is Exhibit O): 'Cablegram received. Seller will authorize you by proper resolution to be filed with us certified copy to go forward to you to close following contract with buyer to be named and be filled in by you. (Then follow details as to gun cotton at 75 cents per pound for March and April deliveries and 63 cents per pound for the remaining deliveries.) When this contract closed will take up with you picric acid contract along same lines deliveries beginning at ninety days based on capacity of 8,000 to 10,000 pounds per day on contract up to January 1916 price dollar sixty-five per pound, understand Crisp has mentioned this to you, message 168.'

"Exhibit W—Letter Bassick to Bankers' Trust Company, February 26, 1915: 'Referring to the contract for picric acid to be signed by the London City & Midland Bank, Limited, of London, for the Ætna Explosives Company of New York, I hereby authorize you or them to insert in the contract the price of one and 65/100 ($1.65) dollars per pound.'

"Exhibit X—Cablegram, Bankers' Trust Company to London City & Midland Bank, February 26, 1915 (Moxham's deleted copy is Exhibit Y): 'Ætna Explosives Company Incorporated have deposited with us certified copy resolution their board of directors authorizing you on their behalf to sign execute seal and deliver a written contract * * * for the sale of picric acid * * * at one dollar sixty-five cents per pound. * * *'

"Exhibit A1—Letter, Bassick to Bankers' Trust Company, March 2, 1915: 'I hereby authorize you to close the contract for two million pounds of picric acid, * * * the price per pound to be one dollar sixty-five cents.'

"Exhibit D1—Cablegram, Bankers' Trust Company to 'Comptonia' London, March 2, 1915: 'Refer our cable twenty-sixth cable specifications required picric acid price dollar sixty-five per pound f. o. b. New York.'"

Those cables, supra, where reference is made to "Moxham's deleted copy," were cables shown to Moxham with the prices omitted. Bassick and John both testified that at one of the early interviews with Moxham, probably the third, they changed the arrangement as to picric acid and substituted for the agreement of 10 per cent. commission, an agreement that Bassick was to receive all in excess of $1 per pound net to Ætna. John, when asked on direct-examination why an exception was made with regard to the compensation of Bassick in regard to the picric acid contract, stated:

"Well, we knew that the price of picric acid was above a dollar a pound after we had received the price at which the French and English governments,

or rather Mr. Crisp and Walter's clients were willing to pay for picric acid, and that the price of one dollar was agreed upon when we informed Mr. Moxham that a higher price than one dollar could be secured for that commodity."

Bassick testified that he could not fix the date of the conversation with Moxham changing the picric acid agreement, except that it was shortly before February 25. John finally testified that the conversation took place after Washington's birthday and was about February 23—obviously an error, as will appear infra. Moxham fixed no date. From the testimony of Hodges, it appears that Bassick and John had agreed with Proctor, prior to February 21, to furnish picric acid to him at $1.50. It is, however, not open to doubt that when the new arrangement was made with Moxham, Bassick already had the information from London as to the $1.65 price (testimony, pp. 903, 961, 962)—in other words, that the interview with Moxham must have taken place at least after Bassick and John had the information contained in Exhibit N, dated February 24, and, perhaps, a day or two later. Human nature is human nature; and there can be no explanation for the change from 10 per cent. to what plaintiffs call the "overage" above a dollar, unless plaintiffs had information that picric acid was commanding high prices in a rising market.

John is shrewd and persuasive, and he knew his man. By this time he realized perfectly that Moxham was sitting in the Ætna offices with his eyes and ears closed, and had not the faintest idea of what was going on in the market, although everybody else seemed to know (Johannet, p. 1173 et seq.; Davis, p. 1028; Peters, pp. 1138, 1139). Moxham had agreed that the cablegrams could be shown to him with the prices deleted, but, nevertheless, the subject of price was discussed. Moxham testified:

"Q. Between Sunday night, when John telephoned you as to the price he was going to get from the French government, and the time when you first saw Bassick, had they ever spoken to you about the price they expected to get for picric acid? A. Yes, frequently. Q. When? A. I cannot remember. We discussed it freely, what hope there was of getting a price, and what the price would be, and all about it. Q. What did they tell you the price would be? A. They didn't know. They didn't know until they tried. * * * They didn't tell me about the London & Midland Bank, but they did tell me about the French contract. Q. When they told you on that Sunday night? A. Yes, sir. Q. They didn't tell you then about their negotiations with the London & Midland Bank? A. They told me about the negotiations, but not the price."

John testified on redirect examination as follows:

"Q. Did he (Moxham) at any time ask you what you were expecting to get on this pending or contemplated English contract which you were trying to negotiate through the trust company here, and the London & Midland Bank in London? A. Yes, sir; he did ask. Q. What did he say? A. 'Well, now, what are you gentlemen getting for this picric acid.' * * * Q. And what did you say to him? A. We avoided the question the best we could, and told him it was understood that the price to us was to be $1, the price to the Ætna was to be $1, and that all in excess was to come to us, and that we had to divide this commission with others, and that the mode and method of the distribution of commission was a matter that we ought to be responsible for. Q. Did he press his inquiry then any further? A. Well, he said that he would like to know, and we told him that if it was just as well we would let

the matter stand as it was. Q. What did he say to that? A. Well, he says, 'I will have to find out what price picric acid is selling for.' Q. What else? A. I think that is all that he said. Q. So that you didn't furnish the information at that time to him? A. No, sir."

Finally, when informed by Bassick that the picric acid contract had been closed at $1.45, Moxham "told Bassick that if I had known that there was any possibility of picric acid selling at that price I would most certainly have changed my figure to them." The clear inference from John's testimony, in answer to the court's questions, is that, prior to the closing of the French offer on March 7, John never told Moxham of the $1.65 price and Moxham's testimony fully confirms this conclusion.

There is no doubt that Bassick and John regarded the Crisp negotiation as serious, and it was still alive on March 6, and yet about March 1, according to John, he told Moxham that "the only legitimate offer" that he had received, or "suggestion of an offer," was for $1.20, "and that offer—it was a suggestion of a possible offer—had been made by Col. Johannet." If John's recollection is right, then the impression sought to be given was that $1.20 was the highest price possibly obtainable, and then only possible. But Johannet testified that the only day on which picric acid was discussed was March 7—the same date when Johannet stated he would close on T. N. T. and gun cotton. Here there is every reason to rely on Johannet's "dossier." If Johannet had mentioned a figure, any one who saw his "dossier" and heard him testify would realize that he would make an accurate note of that fact.

There was no cable nor other corroborative circumstance as in the case of the gun cotton. It may be that John heard talk among the brokers which led him to believe that the French government would buy picric acid, or, perhaps, so concluded as a natural surmise from the fact that there was a market for any military explosive; but I am satisfied that Johannet never talked figures on picric acid until March 7. On that occasion, John asked $1.50, Johannet offered $1.40, and they closed at $1.45. Before the contract for picric acid between Ætna and the French government was executed, the directors (there is some doubt as to Howard) knew of the commission to be paid to Bassick. Howard was not at the meeting of the board on March 9, 1915, although I think Howard was told at some stage of the amount of the commissions.

[8] Egbert Moxham and C. A. Belin protested vigorously against this large commission, but were finally prevailed upon by Moxham to sustain him in the agreement he stated he had made. But this much is certain, that Egbert Moxham, C. A. Belin, and Howard never knew nor were told that Moxham had agreed to be kept in the dark as to the market price of picric and had consented that the prices should be deleted from the correspondence shown him. Egbert Moxham was in a difficult position. His father had put the proposition to him and the others that he had made an agreement and was in honor bound to keep it. That is a hard place in which to put any son. Howard was evidently taking Moxham's word and judgment at this period of the company's history and for some time later, and C. A. Belin the same. But there never can be a ratification by a corporation, acting through

its board of directors, unless the board knows all the facts and the essential fact that this contract was made blindfolded had not been communicated to the board.

[9] What, then, are the results in law to which these facts lead. Bassick was clearly a broker as to picric acid from the moment he agreed to sell explosives, including picric acid, on a 10 per cent. commission basis. The change to the more favorable terms was obtained by the broker without disclosing all the facts known to him. The case might be different if Bassick had been under any legal obligation to buy the product, yet Bassick's theory in his dealings with Moxham seemed to be that he was not under any duty to make disclosures to Moxham. In response to Moxham's request to see copies of the cables, Bassick stated, " * * * But I will not have the price in there," whereupon Moxham asked, "Why not?" to which Bassick replied:

"Because you are not entitled to know it; you made us a price of $1, and all we get over $1 belongs to us; therefore I don't see why you should know it. * * * On the things on which you made us a commission price I am willing to tell you."

It is certainly not within the apparent power of the president or general manager of a corporation to arrange with a broker to be kept in the dark as to the market price of a commodity for the sale of which the broker is to be compensated by "overage." Such an arrangement is not ordinary, but is extraordinary. To sanction it is to hold that, in the absence of express permission of the stockholders, a president or other person in charge of the management of a corporation is authorized by virtue of general authority in the ordinary conduct of business, to make agreements for commissions with purposeful disregard of the information known to his brokers and available to him. Actual fraud is often difficult of proof; but, if any such method of doing business were to be permitted, the way would be easy to commit grave wrongs against the stockholders of corporations, who must depend upon the fidelity of their directors and officers to safeguard their property. The protection against such acts is not limited to the enforcement of appropriate remedies against faithless or incompetent directors and officers. Where the transaction or the agreement is extraordinary, the person dealing with the representative of the corporation is placed on notice and may not rely on such dealing. The only hope for him is that the board of directors may ratify the agreement and such ratification is valid only (1) when made with full knowledge of all the facts, and (2) provided the board itself has power to make such a contract. As already pointed out, the ratification of the board was without full knowledge; for, if Egbert Moxham and C. A. Belin had known all the facts, it may fairly be inferred from their attitude that they would have refused to stand by Moxham's agreement.

[10, 11] But I go further. In my opinion, if it were to be found that the board knew all the facts, they had no power to authorize an agreement so disproportionate as to be unconscionable. It has been settled by Hume v. United States, 21 Ct. Cl. 328, affirmed 132 U. S. 406, 10 Sup. Ct. 134, 33 L. Ed. 393, that even in the case of a sale—

"such a contract, whether founded on fraud, accident, mistake, folly, or ignorance, is void at common law. It is not necessary to invoke the aid of a

court of equity to reform it. Courts of law will always refuse to enforce such a bargain, as against the public policy of honesty, fair dealing, and good morals."

And, as said by Mr. Chief Justice Fuller:

"And there may be contracts so extortionate and unconscionable on their face as to raise the presumption of fraud in their inception, or at least to require but slight additional evidence to justify such presumption. In such cases the natural and irresistible inference of fraud is as efficacious to maintain the defense at law as to sustain an application for affirmative relief in equity. When this is so, if performance has been accepted in ignorance and under circumstances excusing the nonreturn of articles furnished, and these have some value, the amount sued for may be reduced to that value."

Under this so-called "overage" arrangement, Bassick was to receive $1,800,000; i. e., 31 per cent. in round numbers, on a sale of $5,800,000 —an amount obviously so far above anything which can be called reasonable, or even liberal, in the circumstances, as to characterize the agreement, within the famous observation of Lord Hardwicke in Earl of Chesterfield v. Janssen, 2 Ves. Sen. 125, 155, as—

"such as no man in his senses and not under delusion would make on the one hand, and as no * * * fair man would accept on the other, which are unequitable and unconscientious bargains. * * *"

The courts are holding those dealing with corporations to a constantly increasing responsibility and charging them more frequently with notice, where the subject-matter is outside of the ordinary agreements which are necessarily made in the daily conduct of business. Such a judicial trend, even in the case of trading corporations, is in response to the need of safeguarding the rights and property of stockholders often large in number, with small individual holdings, who must rely not only on the fidelity of officers and directors, but also on the rigid application of sensible rules of law developed to meet modern business conditions. A great deal of the important business of the country is necessarily done in corporate form. Sufficient capital cannot be obtained for many large enterprises without the aid of the investing public. It is in the ultimate interest of business and the projection and prosecution of large enterprises that the investing public must feel confident that a just appeal to the courts will not go unheeded, and that the courts will not permit their property to be disposed of under circumstances which amount to a gift, and those dealing with corporations cannot rely, in such event upon the proposition that a board of directors has power, in law, to authorize a gift. Doubtless a natural person, in the absence of fraud or duress, can give away his property. Not so with the directors of a corporation as to corporate property.

It is unnecessary to analyze the many cases cited by both sides. They each stand on their own facts with the applicable principles of law; but I am quite confident that the law is as above stated, whatever the facts may be, and the only question, then, is to determine whether the facts justify the application of the principle. For the reasons stated, I hold that there cannot be recovery for the commissions sued for on this branch of the case on the basis of plaintiffs' claim.

[12] Whether the equitable relief prayed for may be granted is a more difficult question. The case is peculiar. The commissions were paid with full knowledge that Bassick was to receive the "overage," and the deleting of the cablegrams was with full knowledge of Moxham. The concealment took place after Moxham had originally quoted the $1 price, and was a case of overreaching and grasping, and, while what was done in this regard amounted probably to a fraud in law, there was no such conduct as is exemplified in cases like Palmer v. Pirson, 4 Misc. Rep. 455, 24 N. Y. Supp. 333, affirmed 144 N. Y. 654, 39 N. E. 494; Braden v. Randles, 128 Iowa, 653, 105 N. W. 195, and Wadsworth v. Adams, 138 U. S. 380, 11 Sup. Ct. 303, 34 L. Ed. 984. Defendants, while strenuously contending for a recovery back, nevertheless take a position consistent with equity when they say:

"If, however, the court is of opinion that the defendants, by asking for affirmative equitable relief, are in a position where they are obliged to do equity, then it is submitted that the court can determine the reasonable value of the services rendered by the plaintiff * * * to the defendant, in so far as there were any services for which they are equitably entitled to be paid; and, allowing for such reasonable value, can decree the return of the balance of the money received by plaintiffs to the receivers for the benefit of the stockholders and creditors."

The circumstances do not, in justice, require the harsh application of a complete forfeiture of compensation. The service was rendered, and Ætna is to-day manufacturing for and delivering to the French government picric acid under a modified agreement having its inception in the original agreement obtained by Bassick through John. The original agreement and price were advantageous, and, if Bassick had adhered to his 10 per cent. and Ætna had been properly managed, the contract would have been a source of substantial profit at a time of great importance in the history of Ætna. In such a situation (and more could be said) it would be inequitable to order the return of what has been paid to Bassick, viz. some $183,000.

But I think that the facts justify a further compensation to Bassick. This at first may seem inconsistent, but that inconsistency will presently disappear. In Hume v. United States, supra, the court found the market value of the goods and allowed recovery therefor. This was on the theory that the United States had actually received the goods, although the return was excused because of ignorance. If, in the case at bar, Bassick's (and John's) conduct was not such as to justify a forfeiture, then, in principle, the situation is much the same as in the Hume Case. In the Hume Case goods were received and retained, while here the result of Bassick's services was availed of. The contract, being void, could be repudiated at any time, and resort could then be had to fixing the compensation on a fair and reasonable basis. Whether, therefore, viewed from the more strict requirements of the common law or the elastic discretion of equity, the result is that Bassick is entitled on all the facts to the reasonable value of his services, which is but another way of saying he should have what, in the language of the layman, would be called fair.

It appears that, after a certain amount of picric acid was delivered, the contract was canceled, and a new contract with decreased prices

(dependent on dates of delivery) was entered into. Fair compensation, in my opinion, is at the rate of 10 per cent., without interest, on the actual selling price of Ætna to the French government of the amount covered by the commissions, less the amount already paid ($183,000) and less the amount of the Smith and Lenpier notes. In other words, plaintiffs' recovery is not to exceed said 10 per cent., and, as the Smith and Lenpier notes are outstanding, defendants are not to be required to pay those notes and, in addition, a similar amount in this action— or the same amount twice. The exact figures can be worked out in the findings.

### The Canadian Company Contracts.

[13-15] Ætna entered into two contracts with the Canadian Co.: (1) Dated May 12, 1915, for 6,400,000 pounds of smokeless powder, at $1 per pound, upon which Moxham agreed to pay 5 per cent. commission; and (2) dated May 20, 1915, for 1,000,000 pounds of T. N. T., at $1.15 per pound, upon which Moxham agreed to pay the excess over $1—i. e., 15 cents per pound. The complaint was originally framed on the theory that the services performed were those of a broker, but the testimony showed that the services rendered were not in any sense broker's services.

(1) As to smokeless powder: Senator Curry, president of the Canadian Co., and Moxham, knew each other long before John appeared on the scene. Canadian Co. had a contract with the Russian government for the delivery of shells, and needed smokeless powder to fill them. Curry, for his company, was in the market for 4,000,000 pounds of smokeless powder, and was negotiating with Moxham for that quantity at $1 per pound. The specifications had been furnished by the Russian government, and therefore could not be the subject of debate or negotiation. Curry on March 15, 1915, had stated, in effect, that he would be satisfied with deliveries beginning in August, and that "there is no doubt whatever about our wanting the powder, and the advance payment named by you is all right" (Defendants' Exhibit U1; also Defendants' Exhibit M1).

Aside from the details of the formal language of the contract, the only open question of any consequence was the time and method of making payments. The Canadian Co. was at all times ready to make an advance payment of 25 per cent. on the amount of the contract price (Defendants' Exhibit M1). Moxham, at first, had asked for an irrevocable letter of credit for so much of the entire purchase price as had not been paid in advance; then he asked for a 50 per cent. advance payment, and, after that proposition was rejected, he returned to the proposition of an advance payment of 25 per cent., but demanded that it be released so that it could be used by Ætna to build a new plant in Canada.

About this time, viz. in the middle or toward the latter part of March, Moxham decided to employ John to carry on the negotiations. "I told him," testified Moxham, "I was down and out; my patience was exhausted. I could get nowhere with the Senator. I said, 'John, if you, with your patience, can bring him to book and close the con-

tract within a reasonable time, I will be glad to give you a commission for doing it;'" and he agreed to pay John 5 per cent. This was a most extraordinary performance. Here was a responsible concern anxious to buy, with price, amount, and specifications as to material arranged and time of delivery indicated, and only one substantial point outstanding and yet Moxham agreed to pay an outsider over $300,000 for something which any intelligent employé—Sallade, for instance—could doubtless have accomplished.

Of course, John was under no obligation to decline employment because Moxham chose to employ him, instead of either doing all the work himself or assigning one of the officers or employés to do it. Curry had no recollection of ever having previously met John. John testified that he had been introduced to Curry in February, but the circumstance obviously was merely casual, as John, in substance, admitted, because he stated that he did not know whether Curry remembered him. Thus there was absent the personal equation, which is sometimes important in a negotiation. John testified that he had about 50 interviews (inclusive of talks as to smokeless powder and T. N. T.) with Curry. As the T. N. T. contract was signed on May 20, and as John was employed not prior to the middle of March, this means that John saw Curry at least once almost every day for two months—a seemingly exaggerated estimate of the time and effort expended, especially in view of Curry's testimony that John had only 10 or 12 interviews with him. Memory in such matters is not reliable, unless a memorandum (à la Johannet) is kept, and the fact probably is that the number of interviews between these men was somewhere between their respective estimates.

While the discussion as to terms was proceeding, Moxham wrote letters to Bassick and John, evidently intended for Curry's perusal (as, for instance, Plaintiff's Exhibit 44 and Plaintiff's Exhibit 51), in effect threatening to call off negotiations unless the matter was closed. This procedure was the familiar practice known to lawyers as "making a record," and very much in line with what was testified by Curry in pointing out that negotiations were never broken off between him and Ætna, viz.:

"Mr. Moxham, of course, would write very different from what he talked; he would write letters, then I would meet him and, perhaps, have luncheon together, and he would say, 'Why don't we get these things fixed up?' and I would say, 'I am ready to fix them up; it must be your fault.' So the thing went along for a while, and after that, when he saw his position was not tenable, he came down and said, 'We are willing to work with you and assist each other.'"

See, also, Curry's letters to Moxham, Defendants' Exhibits M1 and N1.

The final result as to the method of financing the transaction was a plan whereby Ætna made an issue of bonds, delivered them to Canadian Co. and also elected officers of the Canadian Co. to the directorate of the subsidiary Ætna Company which was to handle the Canadian Co. contract, and Ætna received advance payments in cash under the contract which it was allowed to use for the purpose of building a Canadian plant.

There is a conflict in the testimony of John and Curry as to who suggested the plan. Curry testified that it was his suggestion and was worked out between him and Moxham. John, whose memory on most matters was very keen, was unable to recall some highly important details of the plan, although it is contended on his behalf that the plan was substantially similar to that proposed by John to the French government. Curry is a man of the virile, blunt, straightforward type, and, so far as this record discloses, entirely disinterested in and indifferent to this controversy. There is no reason to doubt that Curry's recollection in this particular is to be relied upon. What took place is very well summarized by Curry as follows:

"Q. In the working out of the details of this plan, * * * between whom were the talks had on that subject, the terms of the contract as finally executed? A. Well, the talks, of course, that were binding and would amount to anything, were had with Mr. Moxham's office and in the presence of his solicitor and two or three of the directors. * * * Mr. John had to do with some of the details of the work, but the basic principle on which we were working was detailed by Mr. Moxham's office."

Much is made of the fact that while the negotiations were pending Curry sent an expert to Canada to look over the situation, with a view to establishing a plant there for the manufacture of smokeless powder by his company. The result of these inquiries, however, was given to Moxham for his use, and the most this incident could amount to would be a natural precaution to see what could be done if Moxham adhered to impossible financing propositions.

The amount actually purchased under this contract of Ætna with Canadian Co. was 6,400,000, instead of 4,000,000, as originally contemplated. It is quite clear that John had no part in obtaining this increase. What happened was that another company from whom Curry had expected to purchase this additional amount was not able to furnish it, and thereupon Curry decided to increase the order to Ætna. Any one who saw and heard Curry on the witness stand would quickly realize that he would know what he wanted. As tersely stated in the testimony:

"Q. What I want to know is, who mentioned that additional 2,400,000? A. I did, of course. Nobody else would know it was wanted except me. Q. Who did you mention it to? A. Mr. Moxham. * * * "

From the foregoing it is obvious that John was not a broker. To be a broker, one must find the customer to whom to sell, or from whom to buy, as the case may be. What John did was to render services in partly assisting to bring a well-developed negotiation to a close. For such service, $300,000 (in round numbers) on a contract of $6,400,000 is nothing more nor less than a gift, which neither the president nor any board of directors had any power to authorize, and the agreement must be declared void, as unconscionable and without authority.

Bassick, of course is entitled to compensation for John's services, and, as the employment was undoubted, and no wrongful element of inducement or concealment enters into the situation, recovery back as matter of law is so doubtful that I have concluded to let the matter rest where it now is. This conclusion is strengthened by the fact that,

while I think the amount paid is more than the services were worth, yet I cannot say that it was excessive to the point of unconscionability. In other words, if originally Moxham had agreed to pay the amount already paid, the court could not have held that such amount, though large was so large as to be unconscionable.

## As to T. N. T.

[16] Curry testified that it was his best recollection that he had told Moxham in February that he would require over 4,000,000 pounds of T. N. T., and that subsequently Moxham asked him to get in touch with Bassick in regard to T. N. T. John testified that, on the first occasion when Moxham spoke of the Canadian Co. matters, Moxham informed him that Curry was prepared to make a purchase of T. N. T. in addition to smokeless powder. In Defendants' Exhibit N1, from Curry to Moxham, dated March 17, 1915, Curry wrote:

"Re Trinitrotoluol: I have been unable to get in touch with Mr. Bassick. The telephone people say he has no office in this city. Am anxious to have this matter settled."

We thus have again a situation where Moxham and John knew that there was a willing purchaser and all that was needed was to follow up the negotiation, and yet the compensation of everything over $1 resulted in giving Bassick 15 cents per pound on a contract of $1,150,-000; i. e., $150,000, or a trifle over 13 per cent. In other words, the agreement was to pay Bassick (John), who had not found the purchaser, over 3 per cent. more than was accorded to him in those original transactions in the early period of Ætna's career, where Bassick (John) had found the purchaser. In addition to what has been said about John, the evidence establishes that nothing was done by Bassick, for the interviews between Curry and Bassick related to other commodities which Bassick desired to sell. It needs no argument to characterize such a contract as void, because unconscionable and a manifest waste of corporate assets.

Here, again, however, the employment is unquestioned, and, as by his abdication Moxham had left the arrangement of the details, including price, to Bassick, the matter will be left where it is, for the same reasons as stated in connection with the Canadian smokeless powder contract.

## The J. P. Morgan & Co. Contracts.

[17, 18] (1) The contract of December 17, 1915. In December, 1915, J. P. Morgan & Co. were representing the French government in the purchase of explosives. About December 10, 1915, Mr. Catchings, of J. P. Morgan & Co., the assistant of Mr. Stettenius (who was in charge of purchases for that firm and with whom Moxham was acquainted), called up Moxham on the telephone and in Moxham's absence was put on Sallade's wire. Sallade, at that time, was Moxham's assistant in handling the military products. Catchings asked whether Ætna was interested in making an offer on gun cotton to the French Republic, and, if so, to let him know. Sallade told Catchings he would

take the matter up "with Mr. Moxham when he came in." Sallade, after talking to Moxham, saw Catchings, quoted a price of 57 cents at first, which Catchings refused, and then Sallade, after telephoning Moxham, offered 1,200,000 pounds a month at 55 cents. Catchings said he would cable the offer. When Sallade returned to the Ætna office, Moxham said he had reconsidered the amount, and wanted to change it to 750,000 pounds per month. The next day Sallade went over to see Catchings, and told him Ætna wanted to make a change; but Catchings said that it was too late, that he had already cabled, but, if the contract should be awarded to Ætna, that "no doubt we could adjust the quantity." The following day Sallade was called into Moxham's office, and John was there, and Moxham said, "You and John go over and see Catchings, and see if they have heard anything of that cable," and Sallade and John went over to Catchings together. Catchings said he had received a lower offer than 55 cents on gun cotton, and that "you had better see Mr. Moxham and see if he cannot reduce his figures." John attempted to argue with Catchings as to cost of raw materials, but Catchings said that did not interest him as in justice to the French government they (J. P. Morgan & Co.) had to accept the lowest figures. Sallade and John went to the telephone, and, in the absence of Moxham, they got Egbert Moxham on the phone. Sallade talked to him, and Egbert Moxham said, "You use your judgment about that, and, if you think it is all right to close for 52½ cents, do so," whereupon "Mr. John and myself went back to see Mr. Catchings, and we made the price of 52½ cents." The next day, according to Sallade's understanding, John was with Moxham and one or the other of them arranged to bill the gun cotton at 55 cents with a 2½ cents discount. (See contract, plaintiffs' Exhibit 34.) "I think," testified Sallade, "Mr. John went over there [to Catchings] alone; I don't know whether they telephoned Mr. Catchings and fixed that up." The next morning Catchings telephoned Sallade that he had heard from France, and wanted to know whether Moxham wished to put in 1,200,-000 pounds per month, or the 750,000 pounds per month. After Moxham had instructed Sallade that the amount was to be 750,000 pounds per month, Sallade telephoned Catchings accordingly. The final result was the contract for gun cotton (Plaintiffs' Exhibit 34), whereby Ætna agreed to sell 5,250,000 pounds to be delivered by July 31, 1916, and, thereafter, 750,000 pounds per month, beginning July 31, 1916, until 30 days after the close of the war.

Bassick's claim is that this contract for additional gun cotton was brought about by John's persistent urging of Johannet to purchase more gun cotton, and that, because thereof, Johannet cabled to his government and thus set in motion the inquiry which J. P. Morgan & Co. made to Ætna through Catchings. On this point the evidence, on first impression, seems somewhat confused, but an analysis of the situation discloses a reasonable explanation of what took place.

Under the contract for gun cotton of March 9, 1915 (Plaintiffs' Exhibit 27) the French government had the option 90 days prior to the expiration of the contract (i. e., prior to December 31, 1915) to purchase 700,000 pounds for three additional months, making a total of

2,100,000 pounds additional. John undoubtedly was present at discussions with Johannet relating to the exercise of this option (Testimony, p. 1317), and no doubt added his arguments to those of Moxham and Sallade while these negotiations were pending.

It is contended that John urged Johannet to have his government purchase additional gun cotton. Sallade thought that John was present when the subject of exercising the option was discussed with Johannet (Testimony, p. 1317). On October 15, 1915, Johannet, in a letter to Ætna (Plaintiffs' Exhibit 37), exercised the option. Between December 10 (the day Catchings telephoned Sallade) and December 17, 1915 (the date of the contract, Exhibit 34), there must have been discussion as to the details of that contract. One of the points embodied in the contract, Exhibit 34, was that the optioned 2,100,000 pounds provided for in the original gun cotton contract of March 9, 1915 (Plaintiffs' Exhibit 27), should be applied under certain conditions against the 5,250,000 pounds of the contract, Exhibit 34.

It was sought by plaintiffs to have it appear that, according to Sallade, that arrangement was made about a month prior to December 17, 1915; but, when Sallade said he was present at the discussion that "ultimately resulted" in applying the option against the 5,250,000 pounds, it is clear that he was referring to the exercise originally of the option which after the Catchings interviews, and before the execution of the December 17 contract, finally resulted in applying the option against the 5,250,000 pounds; and this interpretation of the testimony is confirmed by the following question to and answer by Sallade:

"Q. Do you know of any prior negotiations of your own knowledge? A. That applied on this particular transaction, no."

There is nothing in the record, except hearsay, to show that Johannet, at John's instance, cabled the French government or received any answers back. The burden of showing this was on plaintiffs. Defendants were not under any obligation to prove a negative, viz. to prove that cables not offered in evidence had not been sent. It is not strange that J. P. Morgan & Co., who were then purchasing agents, got in touch with Ætna. By this time, it is fair to presume that the French government knew what explosives it wanted, and it knew from its previous transactions that Ætna manufactured gun cotton. What is more natural than that Catchings should sound Ætna on price and quantity, as he probably did other manufacturers? There was not the slightest excuse for Moxham to send John over with Sallade to see Catchings. Sallade is apparently a very capable man of attractive personality, who would not have, and obviously did not have, any trouble in closing a businesslike deal.

The conclusion is irresistible that John was not the efficient cause of this contract, nor in any sense a broker. If he was, then again the compensation is flagrantly out of proportion to the service. But this transaction is another instance of the employment of John by Moxham to do something. As pointed out, it is difficult to determine what he did, and the amount Bassick has received for his services is very large. Yet here, also, the recovery back is so doubtful (and the water has gone

over the dam) that I have concluded not to sustain the counterclaim nor order an accounting back.

(2) The smokeless powder contracts of March 31, 1916.

[19] (a) The first is the so-called Bridgeport contract for 3,000,000 pounds at 80 cents per pound. The second is for 1,000,000 pounds per month at 80 cents for the first 3 months and 75 cents thereafter, until 30 days after the end of the war. The commission agreed to be paid by Moxham in his letter of March 30, 1916 (Plaintiffs' Exhibit 47), was 3 cents per pound on the first contract and 5 per cent. on the second.

Moxham had learned that a contract which Ætna had with the Bridgeport Projectile Company was for the benefit of the German government, and he refused to fill it. Moxham took up with Davison and Bacon, of J. P. Morgan & Co., the question of their taking over the Bridgeport contract for some of the Allies. John claims that Moxham found the situation a difficult one and asked John to see Johannet. Bacon testified that, during the absence of Stettenius, he had charge of the export department of J. P. Morgan & Co.; that he had known Moxham for 15 years; that Moxham came to see him in March, 1916, having been referred to him by Davison. Negotiations were opened concerning the transfer of the Bridgeport contract and the sale of additional powder. Bacon testified that he had two or three talks with John, but nothing of importance took place between them. There is no doubt that Moxham himself closed this and the 1,000,000 pounds per month smokeless powder contract with Bacon. There is equally no doubt that John busied himself with Johannet as to the Bridgeport contract at Moxham's request, and Bacon's testimony indicates that cables passed between Johannet and the French War Department in regard to this Bridgeport matter. John was in no sense a broker, but he did render service in following up Johannet.

It is difficult to determine whether this contract was consummated as the result of direct instructions from the French government to J. P. Morgan & Co. or whether John's work with Johannet was the proximate cause. In such circumstances the doubt must be resolved by the testimony of Moxham, for, whatever else may be criticized, there is no doubt that Moxham, although at times confused (for he was suffering greatly from an illness when on the stand), was a truthful witness, even to the point of making some very frank and damaging statements. Moxham said:

"I did not say that the Bridgeport projectile transfer was carried on solely by me. John did that; but the negotiations with J. P. Morgan, which negotiations led—and I have to make it clear to you—John was working through Johannet, and I was working through Bacon, practically on the same thing—John made good; I failed. * * *"

And again:

"If it had not been for John, that contract never would have been closed. * * *"

And, further, when asked if he had a conversation with Davison about furnishing the French government with the Bridgeport powder, he answered:

"No; that came directly from negotiations between John and Johannet."

See, also, Bacon's testimony, p. 1374 et seq.

On all the evidence, therefore, I hold this agreement with Bassick (John) valid, and there may be a recovery, with interest from the date of deferred payments. The amount involved was $2,400,000, the compensation $90,000, or about 3.7 per cent.—by far the most modest of all the transactions.

[20, 21] (b) The facts as to the 1,000,000 pounds per month contract are entirely different. There is no evidence of the slightest difficulty in Moxham's negotiation in this regard. The Morgan firm, under instructions of the French government, was in the market for "additional smokeless powder," and "then," as Bacon testified, "we, of course, looked over the field to see where we could get it and proceeded to buy it" (pages 1379, 1380). Not only did Moxham see Bacon before John knew anything about this, but he agreed with Bacon on quantity and price and personally closed the contract.

In the very testimony supra in which Moxham gave credit to John for the Bridgeport transaction, he said, referring to this 1,000,000 per month contract:

"But at the same time I closed this additional contract with Bacon for a million pounds a month to the end of the war. Do you get that position? Q. But I understood you a little while ago * * * to say that John did all the preliminary work, and did all the negotiations in this transaction? A. I did not mean that, referring to the J. P. Morgan million pounds per month order."

Bacon testified:

"Q. Had you had any discussions with anybody representing the Ætna Company in regard to either of these two matters before you had your first talk on the subject with A. J. Moxham? A. No."

John talked with Bacon two or three times, but apparently without any authority whatever from Moxham.

The argument is strenuously advanced that John induced Johannet to cable the French government to order additional smokeless powder, and that the instructions to J. P. Morgan & Co. were the result of these cables, and the testimony of Bacon is referred to in support of this contention. Bacon's testimony, however, does not bear this out. While he knew "generally" that there were such cables "as to the Bridgeport contract," and that "Mr. Johannet had the matter in hand," his testimony otherwise is simply to the effect that J. P. Morgan & Co. "naturally * * * never purchased except under instructions." Of course not. Obviously, a purchasing agent for a government cannot know what to purchase until instructed. Bacon was then asked: "Q. And you were not interested in this matter particularly until after you received these instructions, were you?" and replied, "A. No." He further testified:

"Q. Is it not true that the negotiations which interested the French government in the additional purchase of smokeless powder were carried on by cable between you and Col. Johannet and the War Department, and that it was only when the question of making the purchase came up that you were instructed to carry on the negotiations and close the deal? A. I think that is probably a fair statement of the case. Of course, I was not familiar with all of Mr. Johannet's cables. Q. But you do know that is a fair state-

ment of what occurred? A. I should think it might be. I could not say it was absolutely, because Mr. Johannet was here and is here, of course, representing the French government, and undoubtedly they conferred back and forth. Some cables I knew. Q. You knew that this particular matter was taken up by Col. Johannet in advance of its being taken up by you, did you not, I mean the inquiries about handling the Bridgeport projectile matter, and getting an additional contract with somebody for powder? To that extent you knew it had been taken up by Col. Johannet with the French War Department? A. I should think that was probably true with reference to the Bridgeport matter. The other, the million pounds a month, I am not sure about. Q. I will ask you if the only matter submitted to you in connection with that was not the fixing of price, and if that was not your particular function in the matter, when all the details in connection with that had been carried on? * * * A. I think that was my principal function. However, the question of capacity was gone into in this particular instance by me."

The foregoing is taken by plaintiffs as indicating that J. P. Morgan & Co., in some way, had only a minor part to perform. It is difficult to imagine what else any purchasing agent is required to do than to arrange for the price and satisfy himself of the vendor's ability to perform.

But, in addition to all this, the surrounding circumstances and the inherent probabilities refute John's claim. The war was well on in its second year, and, as above observed, the French government surely did not need John to tell it its requirements for munitions. J. P. Morgan & Co., in the previous December, had closed the gun cotton contract with Ætna for the French government, and Ætna was not a stranger to them. The fact is that the order was practically an automatic matter, and, in this instance, John did not have even a scintilla of authority from Moxham to do anything whatever. Even Moxham was tiring of the efforts of Bassick and John to inject themselves into every transaction. The claim for enormous commissions on this contract, including a continuing monthly return, is little less than preposterous, and has nothing to support it, except an alleged compromise agreement.

It is plain that Moxham had no power to compromise nothing for something; i. e., thousands of dollars of Ætna's money. Bassick testified that he insisted with Moxham that "we were entitled to the commissions as long as this war lasted for any order they received through the French commission." There is not a word of testimony to justify any such claim, and Moxham's letters of March 10, 1915 (Plaintiffs' Exhibit 41), and March 30, 1916 (Plaintiffs' Exhibit 47), distinctly repudiate any such claim. Moxham's statement to the board of directors on May 17, 1916 (Plaintiffs' Exhibit 89), makes neither mention nor intimation of a compromise based on a forbearance of other claims; nor is there anything in Plaintiffs' Exhibits 22 and 23 to support the contention of a compromise. No action was taken at the meeting of April 5, 1916 (Exhibit 22), as to Moxham's report (Exhibit 23), and there was no suggestion that any compromise was under discussion. By this time there was a new board of directors, and there is no evidence that Moxham acquainted them with all the facts. But, had he done so, they had no greater power to give away corporate property than did their predecessors.

### As to the Notes.

[22] Plaintiffs are holders with notice, and therefore all defenses and counterclaims are available against the notes. The extensions of the notes, so far as those notes apply to the void contracts, were without consideration. The board of directors could pass all the resolutions they pleased, but neither they nor the officers could give vitality to promises to pay obligations which had no legal existence. The much relied on minutes of the board meeting of September 22, 1916, merely mean that, if there was liability, it was, in the opinion of the directors, a liability of the company, and not of the directors or officers, and the subsequent conduct of the board fully confirms this view. Indeed, not only did the board not know all the facts, but those facts were not and could not be developed until this trial. It follows that on those notes, which represent payments on void contracts, recovery cannot be had and the notes will be decreed canceled.[2]

[23] Finally, in regard to the agreement as to the 1,000,000 per month smokeless powder contract, it has been shown that that agreement (as in the case of some of the others) was wholly ultra vires. In the United States courts it is settled that part performance will not save an ultra vires contract, and that no amount of performance of an ultra vires contract, even over a long period, or the receipt by the corporation raising the question of the consideration for such a contract, operates to estop the corporation from challenging the validity of the contract or refusing further to perform. Thomas v. Railroad Co., 101 U. S. 71, 86, 25 L. Ed. 950; Penna. R. Co. v. St. Louis, etc., R. Co., 118 U. S. 290, 316, 6 Sup. Ct. 1094, 30 L. Ed. 83; Central Trans. Co. v. Pullman's Car Co., 139 U. S. 24, 55, 59, 60, 11 Sup. Ct. 478, 35 L. Ed. 55; Union Pacific R. Co. v. C., R. I. & P. R. Co., 163 U. S. 564, 581, 16 Sup. Ct. 1173, 41 L. Ed. 265; Pullman's Car Co. v. Central Trans. Co., 171 U. S. 138, 149, 151, 18 Sup. Ct. 808, 43 L. Ed. 108; O'Brien v. Wheelock, 184 U. S. 450, 490, 22 Sup. Ct. 354, 46 L. Ed. 636. The reasons for the doctrine, as repeatedly announced by the Supreme Court, were succinctly reiterated by it in McCormick v. Market Bank, 165 U. S. 538, 549, 17 Sup. Ct. 433, 436 (41 L. Ed. 817):

"The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its lawful powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law."

This agreement for commissions on the 1,000,000 pounds per month contract was so different from the others, and so utterly indefensible in law and equity, that defendants may have their counterclaim or set-off for the amount paid under that agreement, with interest from the date when the answers were served.

2 The status of the stock can also be dealt with in the findings and judgments.

Briefly summarizing: The four 10 per cent. contracts, the first gun cotton contract, and the J. P. Morgan & Co. (Bridgeport) contracts are valid. The picric acid, two Canadian Company, and two J. P. Morgan & Co. contracts are void. In the case of the picric acid, a recovery of 10 per cent. (less credits) on actual sales price of 4,000,000 pounds is allowed. In the 1,000,000 pounds per month contract, recovery is to be had by defendants, and in all other instances no recovery back. This result is to be appropriately worked out in the findings and judgments applicable to the three actions.

In conclusion, I may say that it has not been possible, even in this lengthy opinion (written in the hope of making clear my views by marshaling the facts), to refer to all the facts or all the contentions of law. If anything essential has been overlooked, attention may be directed to such subject-matter on the settlement of the findings and the form of the judgments.